UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| | |
|---|---|
| Amy Domingue ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 15 CV 50191 |
| ) | Magistrate Judge Iain D. Johnston |
| Nancy A. Berryhill, Acting ) | |
| Commissioner of Social Security,[1] ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION AND ORDER

This is an action challenging the administrative law judge's ("ALJ") denial of social security disability benefits to plaintiff Amy Domingue. *See* 42 U.S.C. §405(g). The ALJ concluded that plaintiff's asthma-related problems did not qualify as a severe impairment at Step Two of the five-step process used by ALJs to determine whether a claimant is disabled.

### BACKGROUND

In her opening brief, plaintiff summarized, in a four-and-a-half page, bullet-point list, each of the many asthma-related doctor visits and emergency room trips she made from September 2007 to November 2013. Based this summary, there were 39 visits over a six-year period.[2] Plaintiff reported, to varying degrees, similar asthma-related symptoms, including wheezing, a persistent cough, congestion, shortness of breath, and sinus pressure. She was

---

[1] Nancy A. Berryhill has been substituted for Carolyn W. Colvin. Fed. R. Civ. P. 25(d).
[2] According to plaintiff's list, there were three visits in 2007, three in 2008, three in 2009, ten in 2010, six in 2011, eight in 2012, and six in 2013. These numbers include both visits to the emergency room and office visits to doctors or clinics. There were several lengthy gaps in this history as well. For example, there was almost a 14-month gap, from April 2012 until June 2013, when (according to plaintiff's list) she had no visits at all for asthma problems.

1

typically treated with some combination of a nebulizer, antibiotics, and prednisone.[3] She was usually discharged several hours later and did not appear to ever have stayed more than a day.

On November 20, 2013, a hearing was held before the ALJ. Plaintiff, represented by her current counsel, testified that she was then 37 years old, and was living with her husband and two teenage stepchildren. She previously worked as a sales associate, cashier, factory worker, and a debt collector. She stopped working because of absences due to her health problems. She described her current breathing problems as follows: "I constantly feel like [] I'm drowning []if I'm not sitting almost in a straight up and down position[.] I just []can't breathe[;] it hurts." R. 31. Plaintiff testified that she used a nebulizer, and took Spiriva, Advair, Proventil, Gluconase, Singular, Dulera, and Bydureon. She testified that she used to go to the emergency room for her asthma problems but that she now usually would call her doctor who would send her directly to the Immediate Care Clinic. She estimated that she went to the clinic once or twice a month. She testified that she typically sits inside during the day while her husband goes to work. R. 43 ("Pretty much I just sit and read. Try to watch TV and keep at least my mind busy[.]"). When asked if she did anything for fun, plaintiff answered as follows: "I used to go hiking, camping, fishing. I did horseback riding. I used to be very active with the kids. And then I feel—every time I do we have to plan outings around if I can breathe or not." R. 44.

On April 15, 2014, the ALJ found plaintiff not disabled. At Step Two, the ALJ found that plaintiff's asthma was a medically determinable impairment, but also found that it was not a severe impairment. The ALJ's primary rationale was that plaintiff's "asthma is under control when she is compliant." R. 18. The ALJ explained as follows:

> Although she has repeatedly presented to emergency rooms for wheezing or shortness of breath, she was regularly provided with nebulizer treatment resulting

---
[3] According to *Stedman's Medical Dictionary* (28th Ed.), a nebulizer is a "device used to reduce a liquid medication to extremely fine cloudlike particles; useful in delivering medication to deeper parts of the respiratory tract."

> in marked improvement, and discharged on the same date. The claimant's repeated improvement of her condition with nebulizer treatment also brings into the question just how often she has been compliant with using her own nebulizer at home. Medical records from OSF Medical Center repeatedly note that the claimant's nebulizer was broken, leaving her unable to use it.

R. 18. In addition to this rationale, the ALJ also noted that plaintiff underwent a pulmonary function evaluation by a specialist in January 2012 who concluded that plaintiff's asthma "was under suboptimal control and could not be considered severe with proper treatment." *Id.* The ALJ also relied on the fact that plaintiff's activities were more extensive than she portrayed. As for the medical opinions, the ALJ noted that Dr. Towfig Arjmand completed an RFC assessment dated April 2, 2012, and he concluded that plaintiff was capable of working, although he noted that she should be limited to no more than medium work and should be subject to certain minimal environmental limitations. R. 20. The ALJ only gave this opinion "some weight" because Dr. Arjmand concluded that plaintiff's asthma qualified as a severe impairment at Step Two, a finding which the ALJ disagreed with.

## DISCUSSION

The broad outlines of plaintiff's argument for remand can be boiled down to a simple a proposition: she visited the emergency room or doctor's office 39 times over a six-year period for asthma exacerbations. She believes that this fact proves, in a self-evident way, that her condition was severe, certainly severe enough to meet the lenient standard required at Step Two of the analysis. More specifically, she argues that the ALJ improperly "played doctor" in concluding that plaintiff's hospital visits could have been lessened if she had consistently and properly used her nebulizer at home. Plaintiff further argues that, by deciding the case at Step Two, the ALJ did not consider whether she met a listing—specifically Listing 3.03B (asthma

attacks) and Listing 3.07 (bronchiectasis). In response, the Government argues that the ALJ's decision at Step Two was correct but that, even if were not, any error is harmless.

The Court agrees with plaintiff that it was premature to decide this case at Step Two. The Court notes that the Seventh Circuit has emphasized in several recent cases that the Step Two inquiry is meant to be only "a *de minimis* screening for groundless claims." *See Meuser v. Colvin*, 838 F.3d 905, 910 (7th Cir. 2016); *O'Connor-Spinner v. Colvin*, 832 F.3d 690, 697 (7th Cir. 2016) ("The Step 2 determination is 'a *de minimis* screening for groundless claims' intended to exclude slight abnormalities that only minimally impact a claimant's basic activities."); *Thomas v. Colvin*, 826 F.3d 953, 960 (7th Cir. 2016). In *Meuser*, the Seventh Circuit remanded because the ALJ, in considering whether schizophrenia was a severe impairment, applied a too-demanding standard at Step 2 by "conflat[ing] Steps 2, 4, and 5." 2016 WL 5682715 at *4. The ALJ followed a similar approach here in conflating all these steps into the Step Two analysis. Moreover, the Court concludes that the evidence of plaintiff's many hospital visits and documented problems is sufficient to meet this relatively lax standard of not being a "groundless claims." The record in this case contains evidence that plaintiff was seen by many doctors, and insofar as this Court can tell, none of them questioned whether she was genuinely suffering from recurring asthma exacerbations of some degree.[4]

The Court, thus, turns to the Government's harmless error argument. The harmless error doctrine applies when the court can conclude with certainty that the ALJ would reach the same conclusion absent the error. *Spiva v. Astrue*, 628 F.3d 346, 353 (7th Cir. 2010). Here, the Court is confident that the ALJ would reach the same result on remand even taking into account plaintiff's criticisms about doctor playing and other issues.

---

[4] To be clear, this Court is not affirming the ALJ's decision at Step 2. Instead, the Court is affirming, based on harmless error. The Court recognizes Step 2 denials are rare, but they are not unheard of, and can even be affirmed. *Cross v. Colvin*, 14 CV 50154, 2016 U.S. Dist. LEXIS 32023, *7 n. 2 (N.D. Ill. Mar. 14, 2016).

The Court begins with plaintiff's assertion that she met two listings. In her opening brief, plaintiff states that her multiple hospital visits "would appear" would satisfy these listings "during multiple years." Dkt. #12 at 7. As indicated by the hedge words "would appear," plaintiff's argument is provisional and undeveloped. She does not set forth the specific requirements, nor explain how each is met under the facts of this case. In its response brief, the Government provides a more systematic analysis and lays out the various requirements and then sets forth numerous reasons why plaintiff could not meet these requirements. *See* Dkt. # 17 at 7-9. To cite one example, the Government notes that, under listing 3.07, plaintiff was required to establish, with "appropriate imaging techniques," that she had bronchiectasis, and that plaintiff has not pointed to any diagnosis or an objective test such as a chest CT scan or chest x-ray. *Id.* at 7-8. The Court agrees with these arguments. In her reply, plaintiff does not address the latter argument or the others, except for one brief and conclusory reference to the fact that she received antibiotics. For these reasons, the Court finds that plaintiff has not met her burden of proving that she satisfies these requirements. *See Rice v. Barnhart*, 384 F.3d 363, 369 (7th Cir. 2004) ("The applicant must satisfy all of the criteria in the Listing in order to receive an award of disability benefits [] under step three.").

The Court next turns to plaintiff's criticisms of the ALJ's reasoning. These criticisms are directed at the ALJ's Step Two finding but it is clear that they are the same arguments that would be relevant to a residual functional capacity ("RFC") analysis at Step Four. As noted above, plaintiff focuses almost entirely on the ALJ's assertion about plaintiff's failure to consistently use her nebulizer.

The Court will address the nebulizer-related arguments below. But it is important first to put them in context. Plaintiff's two briefs are notable for what they do *not* address. Although the

nebulizer rationale was important to the ALJ's decision, it was not the only piece of evidence. As discussed below, the ALJ relied on other evidence. In addition, the Government has raised several supporting points as well, which also may be considered given that this is a harmless error analysis. Plaintiff ignores this evidence.

First, the ALJ relied on Dr. Kullberg's outpatient pulmonary evaluation in January 2012. Dr. Kullberg conducted a spirometry test.[5] The ALJ discussed Dr. Kullberg's findings twice, first summarizing them at some length in the narrative portion and then referring to them again the analysis. R. 17, 18. The ALJ noted that Dr. Kullberg found that plaintiff had "dramatic improvement" after taking two puffs of Proventil, and he diagnosed her with "extrinsic asthma, currently under suboptimum control." R. 17. The ALJ further noted that Dr. Kullberg did not believe that plaintiff had "significant chronic obstructive pulmonary disease" and that her asthma "could be reversible based on her spirometry." *Id.* In sum, Dr. Kullberg's findings provide support for the general assertion that plaintiff's asthma could be controlled to some extent.

Second, the ALJ noted that Dr. Arjmand, an Agency doctor, completed an RFC assessment in which he concluded plaintiff was capable of working, albeit limited to medium work with certain environmental limitations. *See* R. 20; Ex. 5F. Dr. Arjmand stated, in relevant part, that plaintiff's asthma "greatly improved" after taking medication.[6] R. 721; 727. In other words, Dr. Arjmand essentially endorsed the ALJ's noncompliance rationale by concluding that plaintiff could control her asthma symptoms to some degree by taking medication. In her reply brief, plaintiff offers no substantive rebuttal to these points other than to make a boilerplate assertion that it is "the norm" to have Agency doctors review these cases and to repeat her

---

[5] Although the parties did not discuss Dr. Kullberg's specialty, he is apparently a pulmonologist. *See* http://health.usnews.com/doctors/fredric-kullberg-507382.

[6] Although Dr. Arjmand did not specifically opine about nebulizer treatments, he summarized the medical record and highlighted instances in which this treatment worked. *See* R. 727 (phrase "improved with neb" is repeatedly).

6

argument (discussed below) that the ALJ played doctor. Dkt. #18 at 2-3. In sum, as the Government notes, the record contains no medical opinions contradicting Dr. Arjmand's opinion or—for that matter—Dr. Kullberg's spirometry assessment. Plaintiff bears the burden of proof. Plaintiff has not offered an opinion from any of the many doctors who treated her over the six-year period at issue. Plaintiff's failure to rebut these medical opinions goes a long way in finding harmless error. And the Court will not, and cannot, play doctor to save plaintiff's case.

Third, the ALJ noted that the record contains many "normal" findings made by plaintiff's treating physicians. The Government summarizes these findings. *See* Dkt. #17 at 6. These include imaging studies revealing no abnormalities aside from a nodular density that did not require any treatment, and treatment records "repeatedly" indicating "normal physical examinations with no wheezing, rales, or [rhonchi]." *Id.* Again, plaintiff offers no rebuttal in her three-page reply brief.

Fourth, as yet another rationale, the ALJ noted that plaintiff's activities, as reported in various places in the record, were inconsistent with her alleged limitations. Specifically, the ALJ stated the following:

> In addition to noncompliance with nebulizer treatment, claimant lives with a cat and two dogs, despite alleging allergies secondary to pet dander. Furthermore, she reported having gone on a hayride despite alleging allergies due to dust and grass. Treatment records indicated that she worked in her yard despite her allegations of allergic reactions. Diagnostic imaging of the chest have revealed no abnormalities that required additional treatment. The claimant does not have oxygen for use at home.

R. 18. Plaintiff again ignores this line of evidence. As for the first point—living with a cat and two dogs—this observation was made by Dr. Kullberg in diagnosing plaintiff as having

"extrinsic" asthma.[7] Specifically, Dr. Kullberg stated as follows: "I believe her condition is aggravated by her cat at home, which is 10 years old, and may not improve until she is out of an environment with cat dander." R. 826; *see also* R.827 ("her [asthma] control may not be possible until she is no longer exposed to cat dander."). Plaintiff did not follow this recommendation insofar as the Court can tell, which suggests that the noncompliance rationale was broader than simply the nebulizer issue.[8] As for the third point—working in the yard—the ALJ did not provide a citation for the source, but the ALJ appears to be relying on treatment notes from November 4, 2013. R. 1139. These notes state that plaintiff came to the doctor's office that day because she had "worked outside and developed [a] productive cough[.]" *Id.* However, as the ALJ noted earlier in the opinion, plaintiff stated in a Function Report that she "never goes outside." R. 15; R. 196 (stating that she used to garden, but did not do so anymore). Moreover, at the hearing, just two weeks after this visit, plaintiff did not mention this gardening incident and gave the impression that regularly she sat inside all day watching television. R. 33, 43.

In sum, as these four points demonstrate, there were multiple pieces of evidence supporting the ALJ's conclusion that plaintiff's asthma could be controlled to some degree through better compliance. In fact, in her reply brief, plaintiff admitted that she could have, and should have, done a better job in complying with treatment recommendations. *See* Dkt. #18 at 2 (acknowledging that she "did have issues with compliance *at times*") (emphasis added).

With these points in mind, the Court considers plaintiff's more narrow argument relating to her alleged inconsistent use of her nebulizer, as well as her related complaint that the ALJ overlooked that she took steroids along with the nebulizer.

---

[7] According to *Stedman's Medical Dictionary* (28th Ed.), extrinsic asthma results "from an allergic reaction to foreign substances, such as inhaled aeroallergens, pollens, dust mites, mold, animal dander, or ingested foods, beverages, or drugs."
[8] Some people (even certain members of the federal judiciary) love their cats—a lot—but taxpayers should not have to pay because of an ailurophile's intentional decision to eschew a doctor's order.

8

As for the nebulizer issue, plaintiff argues that the ALJ overstated how often her nebulizer was broken, arguing that there were only "a few notes in the file" indicating that her nebulizer was not working. Plaintiff also argues that the ALJ overlooked affirmative evidence that she had been using her nebulizer at home before going to the hospital. *See* Dkt. #12 at 9 (there "are multiple notes that indicate she had used her nebulizer at home to no avail").

In response, the Government raises several points. It notes that, despite plaintiff's arguments quibbling over exactly how many times the nebulizer was broken, the fact remains that there is evidence to support the ALJ's claim that the nebulizer was broken some of the time. *See, e.g.*, R. 315 ("Has not been able to us[e] nebulizer because a part is broken"); R. 830 ("She has been unable to use her nebulizer due to dog chewing the tubing."). Moreover, there is also evidence supporting the ALJ's assertion that the nebulizer treatments at the hospital generally worked in a fairly predictable way, as evidenced by plaintiff being released without an overnight stay, such that it is reasonable to expect that this treatment would work some of the time at home if used consistently. Importantly, as described above, the ALJ relied on two doctors (including one specialist) who also believed that plaintiff's exacerbations could have been controlled through better compliance with standard treatments. Dr. Kullberg went so far as to opine that plaintiff's asthma could be reversible. Again, critically, there is no contrary medical opinion in the record. Moreover, even if a person with asthma had to go to the doctor (or even hospital) several times a year, this does not necessarily mean that she could not work full-time. In sum, this Court finds that the parties' disputes about the exact frequency that the nebulizer was used or broken does not alter the larger underlying conclusion that plaintiff was not compliant. *See Jones v. Astrue*, 623 F.3d 1155, 1160 (7th Cir. 2010) ("Rather than nitpick the ALJ's opinion for inconsistences or contradictions, we give it a commonsensical reading.").

9

Plaintiff next argues that the ALJ overlooked that she was often prescribed steroids (specifically, prednisone) along with the nebulizer treatment. Plaintiff asserts that she received prednisone on multiple occasions, and argues that it was "not something she could pick up over the counter." Dkt. # 12 at 9. In response, the Government gets into a debate about whether this steroid was available over the counter. On this discrete point, the record is not clear. But this is a minor issue because, as the Government correctly points out, plaintiff could get a prescription for prednisone from her doctors and did so routinely. *See, e.g.*, R. 830 (doctor observing that plaintiff "has prednisone at home she can take").

In sum, the Court finds that, if this case were remanded, the ALJ would still find that plaintiff was not disabled based on the same noncompliance rationale and other supporting arguments set forth in the current decision. As repeatedly noted throughout this opinion, plaintiff failed to present any medical opinions contradicting the medical opinions upon which the ALJ relied.

## CONCLUSION

For these reasons, plaintiff's motion for summary judgment is denied, the Government's motion is granted, and the decision of the ALJ is affirmed.

Date: April 21, 2017    By: _____
　　　　　　　　　　　　　　　Iain D. Johnston
　　　　　　　　　　　　　　　United States Magistrate Judge